*NOT FOR PUBLICATION*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

_____

DAVID BERNARD HUBERT,          :
                                    :
        Plaintiff,               :
                                      :      Civ. Action No.: 16-2252 (FLW)
v.                                 :
                                    :          **OPINION**
CAROLYN W. COLVIN, ACTING    :
COMMISSIONER OF SOCIAL        :
SECURITY,                     :
                                      :
        Defendant.           :
_____:

**WOLFSON, United States District Judge:**

David Bernard Hubert ("Plaintiff" or "Hubert") appeals from the final decision of the

Acting Commissioner of Social Security, Carolyn W. Colvin ("Defendant"), denying Plaintiff

disability insurance benefits under the Social Security (the "Act").  After reviewing the

Administrative Record, the Court finds that the Commissioner's decision was based on

substantial evidence and, accordingly, affirms that decision.

**I.      FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

Plaintiff was born on April 6, 1968, and was 42 years old on his alleged disability onset

date of April 1, 2011.  Plaintiff has worked as a stockbroker, day trader, personnel recruiter and

basketball referee.  On November 1, 2011, Plaintiff applied for Social Security Disability

benefits based on brain trauma and post-traumatic stress disorder ("PTSD").  That application

was denied, and Plaintiff requested reconsideration, which was also denied.  Plaintiff then

appealed and requested a hearing before an ALJ.  On November 21, 2013, a hearing was held

before ALJ Marguerite Toland.  On June 24, 2014, the ALJ issued a written opinion, finding that

Plaintiff was not disabled.  Plaintiff filed an appeal of the ALJ's decision to the Appeals Council.

On March 7, 2016, the Council issued its own decision, which adopted the ALJ's findings and

conclusions that Plaintiff was not disabled.  Having exhausted his administrative remedies,

Plaintiff filed his Complaint in the instant action.

a.      **Function Reports**

In his Function Report, Plaintiff submitted that he sustained two head injuries and, as a

result, he cannot "remember simple things" because of his poor memory and concentration.  See

Administrative Record ("A.R.") at 248-55.  Despite his injuries, Plaintiff lives alone in his

apartment, but experiences some difficulty performing personal care and preparing his own

meals.  Id. at 248-49.  In addition, Plaintiff stated that he experiences trouble sleeping, and he

wakes up multiple times throughout the night.  Id.  Plaintiff, however, explained that he is able to

go outside, and is capable of driving a car, walking and using public transportation.  Id. at 251.

Plaintiff also stated that he is able to shop online and manage his own finances, which includes

paying bills, handling a savings account, counting change and using a checkbook/money orders.

Id.  Plaintiff's hobbies include being a basketball referee.  Id. at 252.  While he spends time with

his family and friends, Plaintiff noted that "I am very short and get frustrated easily." Id. at 252-

53.

Beverly Hubert ("Ms. Hubert"), Plaintiff's mother, also submitted a function report on

behalf of her son.  See id. at 256-63.  She specifically stated that, after his head injuries, Plaintiff

"[d]oesn't remember [and] can't concentrate so [he] can't complete certain tasks [and] follow

instructions without help – caus[ing] great frustration." Id. at 261.  Ms. Hubert also stated that

Plaintiff has trouble sleeping and he takes sleeping pills.  Id. at 257.  Despite his general

lethargy, Ms. Hubert noted that Plaintiff has no problem with his personal care, and he cooks his own meals or "orders out." Id. at 257-58. He also goes shopping for food on a weekly basis, and he shops online. Id. at 259. Ms. Hubert noted that Plaintiff can drive an automobile, walk and ride a bicycle, and he engages is "moderate cardio" exercise about once a week. Id. at 259-60. With respect to social activities, Ms. Hubert stated that Plaintiff's "good friends stop by to check on him [but] otherwise he is isolated." Id. at 260.

**b.**     **Review of the Objective Medical Evidence**

**1.**     **Medical Evidence**

On May 25, 2011, Plaintiff saw Theodore J. Batlas ("Dr. Batlas"), Psy.D., for an initial neuropsychological consultation. Id. at 312. During that consult, Dr. Batlas noted that Plaintiff sustained a head injury in 1995, and that his "medical history indicates several probable, additional concussions." Id. According to Dr. Batlas, Plaintiff reported the following symptoms: "headaches, significant weight change, sensitivity to light, tinnitus, change in taste, change in smell…, loss of balance, poor coordination/dizziness, nausea, sleep difficulty, poor concentration, changes in personality, feelings of depression, feelings of irritability, frequent racing thoughts, cold hands/feet (sometimes), and flashbacks." Id. However, Dr. Batlas noted that Plaintiff presented as alert and oriented, and his "[a]ffect and mood were remarkable for mild levels of anxiety and depression." Id. at 313. Plaintiff also reported alcohol and marijuana abuse and erratic behavior, which Dr. Batlas found to be consistent with PTSD. Id. Dr. Batlas recommended that Plaintiff undergo a full neuropsychological evaluation. Id.

On June 27, 2011, Dr. Batlas performed a neuropsychological evaluation on Plaintiff. Id. at 309-311. The testing revealed that Plaintiff has "select deficits on some aspects of verbal memory and learning" and some "difficulty with attention was noted." Id. at 311. According to

Dr. Batlas, "[v]isual memory and all other tested verbal-cognitive, visual-perceptual, problem-solving, and processing speed abilities were found to be intact," but "[o]bjective personality testing indicated some symptoms of anxiety." Id. Dr. Batlas recommended that Plaintiff undergo a brief course of weekly biofeedback therapy to facilitate general relaxation and stress reduction, and a brief course of cognitive remedial therapy to develop compensatory cognitive strategies and to improve his memory. Id. Dr. Batlas also recommended a psychiatric consultation. Id.

On August 8, 2011, Plaintiff visited Peter Q. Harris ("Dr. Harris"), M.D., who performed an initial psychiatric assessment. Id. at 306. Dr. Harris noted that Plaintiff suffered a head injury during a basketball game, but "after two or three years he fully recovered from that head injury." Id. Dr. Harris further noted that Plaintiff also "suffered a second brain injury in a barroom fight… [where] he was struck in the middle of the forehead by a fist." Id. According to Dr. Harris, Plaintiff "did not think he had any significant injuries [as a result of the second head injury], [but] since that time he notes difficulties with memory, concentration, and focus," as well as irritability and depression. Id. Plaintiff reported that he has "a very short fuse and can be aggressive." Id. Nevertheless, Dr. Harris observed that Plaintiff was casually dressed and physically fit, and that he was "not obviously" depressed. Id. at 307. Dr. Harris found no evidence of psychosis, but he stated that "[c]ognitively, he is grossly intact, although on formal testing there are some significant deficits."[1] Id. Dr. Harris diagnosed post-concussive syndrome, and assigned a global assessment of functioning (GAF) score at 55, indicating moderate psychological symptoms. Id. Dr. Harris recommended that Plaintiff take an anti-seizure medication for his emotional instability, an antidepressant for his anxiety and agitation or a

---

[1] Dr. Harris did not elaborate on what "significant deficits" Plaintiff suffered.

4

stimulant for his concentration.  Id. at 308.  Plaintiff decided to try the stimulant first, so Dr.

Harris prescribed Ritalin.  Id.

On August 18, 2011, Plaintiff, again, visited Dr. Harris, and Plaintiff reported that

Trazodone was helping him sleep, and that, despite some unusual side effects, Ritalin was also

helping Plaintiff with his concentration.  Id. at 303.  Dr. Harris also prescribed Depakote to

"address [Plaintiff's] extreme emotional lability and episodic rages."  Id.  On September 1, 2011,

Plaintiff reported that he felt more in control and focused with the addition of Depakote, but he

did have some issues with nausea in the mornings.  Id.  Dr. Harris noted that Plaintiff continued

to suffer from memory and concentration problems, and the doctor advised Plaintiff "to consider

going out on disability."  Id.  On September 15, 2011, Dr. Harris reported that "the Depakote was

helping somewhat," but Plaintiff had experienced a severe "outburst" since the last visit.  Id.  On

September 22, 2011, Dr. Harris found that Plaintiff "continues to be markedly labile."  Id. at 302.

Dr. Harris suggested that Plaintiff take an antidepressant, but Plaintiff was reluctant.  Id.  On

September 29, 2011, Dr. Harris noted that Plaintiff stopped taking Ritalin because of the side

effects; Dr. Harris instead recommended that Plaintiff take half a pill.  Id.  Plaintiff was also

prescribed Celexa, an antidepressant.  Id.

On April 26, 2012, Plaintiff visited Victoria Miller ("Miller"), Ph.D., who performed a

consultative psychological evaluation at the request of the Social Security Administration.  Id.

316.  Plaintiff reported that he suffers from agitation, poor job performance, difficulty sleeping

and problems with his appetite.  Id. at 316-17.  Dr. Miller noted that Plaintiff "presented as a tall

gentleman who was cooperative and alert and coherent throughout the exam," and that "[h]e was

appropriately-dressed, well-groomed, and appeared to be a fit individual of weight proportionate

to height."  Id. at 318.  Additionally, Plaintiff reported that "he can manage his own [activities of

daily living] and perform daily grooming and hygiene tasks without difficulty." Id.
Nevertheless, Plaintiff stated that "smaller tasks are now monumental," and that his girlfriend
assists him with some of his chores. Id.

Dr. Miller noted that, during the evaluation, Plaintiff appeared to be somewhat restless
and agitated, but he made appropriate eye contact and spoke fluently, with intermittent stutters.
Id. Dr. Miller observed that Plaintiff had difficulty following conversations and appeared to be
frustrated. Id. In addition, Dr. Miller stated that Plaintiff was able to successfully perform
several cognitive tasks, including recalling the names of the current and former presidents and
spelling "world" both forwards and backwards. Id. Plaintiff could also count "by 3's without
errors, but his output was extremely slow." Id. Dr. Miller found that Plaintiff had limited
judgment and insight "with indications of limited impulse control." Id. While Plaintiff "was
dysphoric and anxious," Dr. Miller found no indication of any thought disorder. Id. Dr. Miller
diagnosed Plaintiff with a cognitive disorder and anxiety disorder. Id. at 319. She assigned
Plaintiff a GAF score of 50, indicating serious but borderline moderate psychological symptoms.
Id. (Tr. 319). Although his prognosis was "guarded," Dr. Miller explained that Plaintiff
"presents with both emotional difficulties and problems related to mentation and problem-
solving…." Id.

On August 27, 2012, Dr. Harris saw Plaintiff and reported that he remained "distracted,
irritable, and moody," and that the medications were no longer helpful, but Plaintiff did not want
to experiment with additional medications. Id. at 321.

**2.      Medical Opinion**

On October 3, 2011, Dr. Harris drafted a letter in connection with Plaintiff's negotiations
with the Internal Revenue Service, indicating that Plaintiff suffered from a severe traumatic brain

injury that made it difficult for him to attend to any of his responsibilities. <u>Id.</u> at 332. Dr. Harris reported that Plaintiff was "distracted, forgetful, and confused at times," and suffered from marked mood swings, and generally, "had a major deterioration in functioning" since his brain injury. <u>Id.</u>

On January 5, 2012, Dr. Harris wrote a narrative report in which he opined that, "[s]ince it has been almost two years since [Plaintiff's] second injury and since he remains profoundly disabled, it is unlikely he will gain significant functioning in the foreseeable future." <u>Id.</u> at 323. Dr. Harris continued, "[i]t is noteworthy that despite all the limitations, he is able to perform one activity, namely, refereeing basketball. Apparently, in this role he is able to perform routine behaviors that are well-learned and do not require any particular creative skills." <u>Id.</u> Finally, Dr. Harris stated that "Mr. Hubert is truly a tragic case of an individual who fully recovered from a severe head injury, however, a second injury has caused major cognitive dysfunction with little hope that he will ever regain his previous abilities." <u>Id.</u>

On February 1, 2012, Dr. Batlas wrote a narrative report in which he stated that Plaintiff was diagnosed with a concussion, post-concussion syndrome, and learning disabilities. <u>Id.</u> at 315. Dr. Batlas opined that, based on the long-term nature of his symptoms, "it is determined that his condition would exceed twelve months in duration." He further opined that "[t]he prognosis for recovery, which is doubtful, would exceed twelve months in duration." <u>Id.</u> Accordingly, "[d]ue to his reported difficulties in maintaining employment as well as evidence of cognitive difficulties on neuropsychological testing, [Dr. Batlas was] of the impression that [Plaintiff] cannot maintain full-time, competitive work." <u>Id.</u>

On June 29, 2012, Clara Castillo-Velez ("Dr. Castillo-Velez"), Ph.D., a state agency psychologist, reviewed Plaintiff's medical records and opined that he was moderately limited

with regard to: carrying out detailed instructions; maintaining attention/concentration for extended periods; completing a normal workday/week without interruptions from psychologically based symptoms; performing at a consistent pace; responding appropriately to changes in the work setting; setting realistic goals; and making plans independently from others. Id. at 76-78. Dr. Castillo-Velez also found that Plaintiff had no significant limitations and concluded that he could perform simple tasks. Id. On October 15, 2012, Thomas Yared ("Dr. Yared"), M.D., a state agency psychiatrist, affirmed Dr. Castillo-Velez's findings. Id. at 88.

On August 28, 2012, Dr. Harris wrote a letter in which he opined that "[t]here is no question at this time [that Plaintiff] is totally disabled by his Post Concussive Syndrome. There is no expectation of any recovery, given the duration of his symptoms." Id. at 320. According to Dr. Harris, Plaintiff had "marked difficulties with memory and concentration, frequently gets lost while driving, becomes overwhelmed, frustrated, and angry. He is barely able to manage simple tasks. This is in marked contrast to his previous career with Bear Stearns." Id. at 320.

On September 22, 2013, Dr. Harris completed another Psychiatric/Psychological Impairment Questionnaire, and opined that Plaintiff had "moderate" to "marked" limitations in all areas of work-related mental functioning. Id. at 333-40. According to Dr. Harris, Plaintiff would miss work at least three times per month and could not tolerate even low stress work environment. Id. at 339-40. However, he opined that Plaintiff could manage benefits in his own best interest. Id. at 340.

On February 14, 2014, Dr. Harris completed a Medical Source statement in which he opined that Plaintiff had "marked" to "extreme" limitations of his ability to perform work-related mental function. Id. at 359-60. However, he opined that Plaintiff was able to manage funds in his own best interest. Id. at 361.

c.      **Review of the Testimonial Record**

1.      **Plaintiff's Testimony**

On November 21, 2013, Plaintiff testified at the administrative hearing before the ALJ. See A.R. 33-70.  At the hearing, Plaintiff stated that he sustained his first head injury in 1993 when he was "flagrantly fouled" during a basketball game, and that his "head hit the concrete and [he] lost all olfactory senses."  Id. at 48.  According to Plaintiff, "[t]o this day, I still have no sense of smell whatsoever."  Id.  Additionally, Plaintiff testified that, during a fight, he sustained his second head injury in 2010 when other person "smashed [him] in the head."  Id. at 49-50.  Plaintiff testified that he sustained concussions as a result of these head injuries, and that he experiences "super migraine headache[s]" about once a month.  Id. at 51-53.  In addition, Plaintiff testified that he has trouble with his memory, specifically "[a]bsorbing information, simple information," and that "there's definitely depression, and when I realized my mental capabilities compared to where I was, I mean, it's definitely a struggle every day."  Id. at 54-55.  Plaintiff explained that he has emotional outbursts, and he "erupt[s] over silly things."  Id. at 60.

With respect to his daily activities, Plaintiff testified that he is able to drive, but he does not "drive very often" because he "tend[s] to get lost."  Id. at 38-39.  Plaintiff testified that he will "get lost and pass places [he has] known for all [of his] life, including [his] own house."  Id. at 39.  Plaintiff also testified that he does not "go shopping or anything at the store."  Id. at 57.  He further stated that he does not "go on the computer that much," but he does go online to shop because he does not "like to go to any stores anymore and I can't."  Id. at 58.  Plaintiff testified that his brother comes and checks on him, and helps Plaintiff with some of his chores, such as going to the store.  Id. at 60.  Finally, Plaintiff testified that he does not sleep well, and he must nap when he feels "slight dizziness, uncomfortableness."  Id. at 61.

### 2. Vocational Expert's Testimony

Louis P. Szollosy ("Szollosy"), a vocational expert, testified before the ALJ. Id. at 63-69.

At the hearing, the ALJ asked Szollosy to assume a hypothetical individual who was able to

perform a full range of work at all exertional levels, but had the following limitations:

> [T]his individual cannot climb ropes, ladders, or scaffolds. He cannot work
> around heights or dangerous machinery, and I'll define that as machines that cut
> or shear. This individual is limited to simple and detailed tasks, but would be
> limited to working in a low stress setting, and I'll define low stress as work that
> would not involve a fast production rate pace or strict production quotas.

Id. at 65. In response, Szollosy testified that Plaintiff could not perform his past work as a

stockbroker, personnel recruiter or trader. Id. at 63-65. She reasoned that Plaintiff could not

perform those jobs "because of the required complex, complex interfacing with instructions

verbally and in writing." Id. at 65. However, Szollosy testified that Plaintiff could perform the

following jobs that exist in significant numbers in the national economy: furniture assembler,

inspector and inserter. Id. at 65-67.

### d. Review of the ALJ's Decision

The ALJ issued her written decision on June 24, 2014. Id. at 14-27. The ALJ concluded

that "the claimant was not under a disability within the meaning of the Social Security Act from

April 1, 2011, through the date of last insured." Id. at 14. In reaching that determination, the

ALJ concluded that Plaintiff's date of last insured was March 31, 2012.[2] Id. at 16. The ALJ

determined that Plaintiff was not engaged in substantial gainful activity, even though he earned

$6,580 in 2011. Id.

---

[2] The Appeals Council later concluded that Plaintiff's date of last insured was March 31, 2013.
Id. at 4-7. However, as discussed infra, the Appeals Council concluded that the change in the
date of last insured did not affect the conclusion that Plaintiff was not disabled. Id.

Next, the ALJ concluded that Plaintiff suffered from the following severe impairments: post-concussion syndrome and depression.  Id.  While the ALJ found that Plaintiff's post-concussion syndrome was a severe impairment, she noted that "there is little evidence in the record that the [Plaintiff] actually experienced concussions."  Id.  In addition, the ALJ concluded that there was insufficient evidence in the record to support a finding that Plaintiff suffered from migraine headaches, but the ALJ stated that she would still consider the non-severe impairments throughout her analysis.  Id. at 16-17.  Finally, the ALJ found that Plaintiff "did not have an impairment or a combination of impairments that met or medically equaled the severity of one of the limited impairments in 20 CFR Part 404, Subpart p, Appendix 1."  Id. at 17.

With respect to his residual functional capacity, the ALJ determined that Plaintiff was able "to perform a full range of work at all exertional levels but with the following non-exertional limitations: he is restricted from work around heights or dangerous moving machinery (such as machines that cut or shear)."  Id. at 18.  The ALJ also determined that Plaintiff "cannot climb ropes, ladders or scaffolds," and that he "is limited to simple tasks, to work in a low-stress setting (defined as work that would not involve a fast production-rate pace or strict production quotas) and would be off-task 5% of the workday, in addition to normal breaks."  Id.

The ALJ specifically concluded that Plaintiff's "self-reported activities of daily living are inconsistent with an individual experiencing totally debilitating symptomatology."  Id. at 20.  She reasoned:

> In his Function Report, the claimant admitted he lived alone, performed household chores, prepared meals, did the laundry, used public transportation, drove a vehicle, shopped online, handled finances and spent time with others. Ms. Hubert [the Plaintiff's mother] also admitted the claimant had no problem with personal care activities, prepared simple meals, did laundry, drove a car, shopped in stores and online, handled finances, engaged in moderate

cardiovascular exercise and spent time with a few friends.  In an April 2012 consultative examination, the claimant admitted he could manage his own activities of daily living and perform daily grooming/hygiene tasks without difficulty.  At the hearing, he admitted [that he went grocery shopping] with his brother, washed the dishes, used a computer and shopped online.

Id. at 20 (citations omitted).

With respect to his medical history, the ALJ provided an in-depth recitation of the medical evidence and concluded that "[t]he clinical and objective finding are also inconsistent with an individual expressing totally debilitating symptomology."  Id. at 19-20.  Although Plaintiff sustained his first head injury in 1993, the ALJ found that "[t]he record does not document this purported injury and even if this injury did occur, [Plaintiff] went on to return to work, perform[ing] a highly skilled job and earn[ing] substantial amounts."  Id. at 20.  Nonetheless, the ALJ acknowledged that "a 1994 medical report" referenced that Plaintiff "sustained diminished taste sensitivity and complete loss of smell...."  Id. at 20.  In addition, the ALJ noted that Plaintiff also "reportedly lost consciousness briefly after his injury and complained of extreme dizziness and difficulty holding down food for several weeks after this incident."  Id.  Finally, the ALJ found that, at the time of the first head injury, Plaintiff "denied any memory loss or attention difficulties...."  Id.

With respect to his second brain injury in 2010, the ALJ noted that Plaintiff "testified that he did not seek any treatment for this injury from a physician or hospital; accordingly, he testified he had no diagnostic studies from this incident."  Id.  However, the ALJ further stated that Plaintiff testified that "he began to have symptoms such as poor memory, irritability and frustration."  Id.  "Despite his symptoms, he admitted he helped watch and take care of his girlfriend's 8-year-old daughter, could go to the store and go grocery shopping, could use a computer and could drive, though he did not enjoy doing so."  Id.

After discussing Plaintiff's own testimony, the ALJ reviewed the following medical evidence: (i) Dr. Batlas' May 2011 report from Plaintiff's initial neuropsychological consultation, as well as an evaluation that occurred in June 2011; (ii) Dr. Harris' psychiatric assessments in August 2011; (iii) additional treatment notes from Dr. Harris from August and September 2011; (iv) Dr. Harris' October 2011 letter that was submitted to the Internal Revenue Service, outlining Plaintiff's injuries and symptoms; (v) Dr. Batlas' February 2012 narrative report; (vi) Dr. Miller's consultative examination of Plaintiff in April 2012; and (vii) Dr. Batlas' treatment notes from August 2012. Id. at 20-23.

The ALJ then discussed the opinion evidence. With respect to a January 2012 evaluation and report, the ALJ assigned great weight to Dr. Harris' GAF score of 55 "as it balances [Plaintiff's] purported functional limitations with his actual daily activities" of handling his finances and his ability to drive and go shopping.[3] Id. at 23. However, the ALJ assigned little weight to Dr. Harris' opinion that Plaintiff in unable to tolerate any work situations without becoming overwhelmed, as well as the opinion that Plaintiff is incapable of even low stress work. Id. The ALJ reasoned that Dr. Harris' opinions are "internally inconsistent and not supported by the objective medical evidence; specifically, though Dr. Harris opines [that Plaintiff] could not sustain any work, [but] he found [that Plaintiff] had only moderate difficulties with simple tasks (which would not necessarily reflect a total inability to perform work-related activities)." Id. In addition, the ALJ reasoned that Dr. Harris' opinion "is inconsistent with the objective evidence that reveals an improvement in

---

[3] The ALJ noted that the DSM-V has eliminated the used of the GAF scale, and stated that "the GAF scores noted in this record are not dispositive of impairment severity or ability to meet the mental demands of work; rather, they represent medical opinions that require supporting evidence to be afforded significant weight." Id. at 21 n.1.

[Plaintiff's] condition with medication compliance and demonstrates a residual ability to handle finances, go shopping, drive a vehicle and engage in other significant daily activities." Id.

The ALJ also assigned no weight to Dr. Batlas' February 2012 opinion that Plaintiff could not maintain full-time, competitive work, because "the issue of disability is reserved to the Commissioner" and that opinion "is quite conclusory, providing very little explanation of the evidence relied on in forming that opinion." Id. at 24. The ALJ further noted that Dr. Batlas appears to be unfamiliar with the definition of "disability" under the Social Security Act and regulations, and that "it is possible that he was referring solely to an inability to perform... past work, which is consistent with the conclusions reached in this decision." Id.

In connection with a June 2012 psychological evaluation, the ALJ assigned great weight to the opinions of Drs. Castillo-Velez and Yared, who concluded that Plaintiff had "moderate limitations" with respect to:

> [C]arrying out detailed instructions; maintaining attention/ concentration for extended periods; completing a normal workday/ week without interruptions from psychologically based symptoms; performing at a consistent pace without an unreasonable number/length of rest periods; responding appropriately to changes in the work setting and with setting realistic goals or making plans independently of others.

Id. In addition, the ALJ noted that Drs. Castillo-Velez and Yared also found that Plaintiff "had no significant limitations and concluded [that Plaintiff] could perform simple tasks." Id. According to the ALJ, those opinions "are consistent with the objective medical evidence and [Plaintiff's] broad range of daily activities, such as his ability to use public transportation, handle his finances and use a computer." Id.

In an August 2012 letter, Dr. Harris opined that Plaintiff "had marked difficulties with memory/concentration, frequently got lost when driving and became overwhelmed, frustrated and angry," and he also stated that Plaintiff "could barely manage simple tasks and opined [that Plaintiff] was totally disabled." Id. The ALJ concluded, however, that "the issue of disability is reserved to the Commissioner and Dr. Harris' opinion on the matter is entitled to no weight." Id. In addition, the ALJ found that Dr. Harris' opinion that Plaintiff had severe memory and concentration problems and that he could barely manage simple tasks to be "in stark contrast to [Plaintiff's] admissions that he could handle finances, use a computer and drive an automobile," and thus, entitled to little weight. Id.

In his September 2013 evaluation, Dr. Harris opined that Plaintiff was incapable of low stress work and speculated that Plaintiff would likely be absent from work more than three times per month. However, the ALJ assigned little weight to this opinion, since "it is inconsistent with both [Plaintiff's] broad range of daily activities and with the objective medical evidence, which reveals, at most, moderate difficulties with work-related tasks… and suggests minimum social functioning difficulties (as indicated in independent examination, during which examiners noted no significant interpersonal deficits)." Id. at 25.

The ALJ also noted that Dr. Harris submitted a Medical Source Statement in February 2014, where he concluded that Plaintiff could never be exposed to unprotected heights or moving mechanical parts. Id. In addition, the ALJ stated that Dr. Harris opined that Plaintiff "could occasionally operate a motor vehicle, withstand frequent exposure to extreme cold/heat and tolerate continuous exposure to humidity, wetness, dust, odor, fumes and pulmonary irritants." Id. According to Dr. Harris, because of his memory and concentration problems, Plaintiff had difficulty engaging "in work-related activities without

constant supervision."  However, the ALJ assigned partial weight to Dr. Harris' opinions, specifically "finding that although it would be prudent to restrict [Plaintiff] from heights, dangerous machinery, ropes, ladders or scaffolds (due to his distractibility and poor focus), there is no basis for restricting [Plaintiff] from pulmonary irritants or temperature extremes or from restricting operation of a motor vehicle."  Id.

Dr. Harris submitted a Medical Source Statement in February 2014, and the ALJ assigned little weight to the opinion that Plaintiff "had marked to extreme limitations in all subject areas," and that he is unable "to handle complex tasks since his brain injury."  Id. The ALJ found Dr. Harris' opinion to be "a gross exaggeration of the [Plaintiff's] functional restrictions and inadequately considers the [Plaintiff's] daily activities."  Id.  The ALJ further explained that, while Plaintiff "may have some memory and concentration difficulties, in light of his residual abilities, there is little evidence that these difficulties rise to the level or 'marked' or 'extreme.'"  Id.  The ALJ concluded that Dr. Harris' opinion does not adequately account for Plaintiff's ability to "handl[e] finances, shopping, driving or performance of chores."  Id. at 26.

At the conclusion of her residual functional capacity assessment, the ALJ determined that, "[a]lthough [Plaintiff] certainly has some memory/concentration difficulties, these difficulties would not rule out all work-related activities but instead can be adequately accommodated with appropriate restrictions."  Id.  Next, the ALJ found that Plaintiff was not capable of performing his past relevant work, but she determined that Plaintiff could perform the following jobs, which exist in significant numbers in the national economy: (i) chair assembler; (ii) inspector; and (iii) inserter.  Id. at 26-27.  In reaching that conclusion, the ALJ relied on the testimony of Szollosy, the vocational expert.  Id. at 27.

16

e.      **New Evidence on Appeal**

On June 30, 2014, Dean Weiss ("Dr. Weiss"), M.D., a doctor in California, reported that he had seen Plaintiff since 2005 for head injuries and migraine headaches.  Id. at 368.  Dr. Weiss noted that he prescribed Plaintiff medical cannabis for his symptoms.  Id.

On September 22, 2014, after Dr. Harris had reviewed the hearing decision in this matter, he opined that "it is clear that Judge Toland decided that Mr. Hubert was not disabled and then coddled (sic) together snippets of information to support her decision.  It remains my professional opinion that Mr. Hubert remains unable to engage in gainful employment."  Id. at 372.  Dr. Harris reasoned that Plaintiff "has significant impairment in memory and concentration that precludes him from engaging in any work related task without constant supervision."  He continued, "[Plaintiff] can't tolerate novel or stressful situations without becoming confused or emotionally overwhelmed," and he has "not demonstrate[d] an ability to function in a real world setting."  Id.

On February 25, 2015, Dr. Batlas opined in a "Treatment Update" that, "[a]s stated in my report of February 1, 2012, patient is not capable of full-time competitive employment, including remunerative unskilled work."  Id.  at 374.

On June 18, 2015, Dr. Harris completed a Neurocognitive Disorder Questionnaire in which he opined that Plaintiff had a "severe" cognitive disorder and was "fully dependent" in all activities, and that Plaintiff had "marked" restrictions of activities of daily living, maintaining social functioning, and concentration, persistence or pace.  Id. at 377-78.   Dr. Harris further opined that Plaintiff had repeated episodes of decompensation, as well as "[a] residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause decompensation."  Id. at 378.

In a Mental Impairment Questionnaire completed on the same date, Dr. Harris opined that Plaintiff would be expected to miss work more than three times per month and that his described symptoms and limitations existed as far back as 2011. Id. at 387.

**f.      Review of the Appeals Council's Decision**

The Appeals Council issued its written opinion on March 7, 2016. Id. at 4-7. As a preliminary matter, the Council determined that Plaintiff was actually "insured for a period of disability and disability insurance benefits through March 31, 2013, rather than March 31, 2012, the date of last insured used in the hearing decision." Id. at 5. Thus, "there was an unadjudicated period in the decision" of the ALJ. Id. Nevertheless, after adopting the ALJ's findings and conclusions, the Appeals Council determined that Plaintiff "was not disabled, as defined in the Social Security Act, at any time through March 31, 2013, the date of last insured." Id. at 7. Indeed, the Council stated that it "reviewed [the] new evidence on appeal... [but] finds that this evidence, including both medical treatment records and additional opinions, does not materially affect the findings or the ultimate unfavorable determination in the case." Id. at 5.

Specifically, the Council stated that Dr. Harris submitted a letter "reiterating his prior opinion that [Plaintiff] is unable to engage in gainful employment." Id. However, the Appeals Council found Dr. Harris' opinion to be conclusory and "one that is reserved to the Commissioner." Id. The Council also questioned whether Dr. Harris was "familiar" with the definition of "disability" under the Social Security Act. Id. In addition, the Appeals Council reviewed a Neurocognitive Disorder Questionnaire and a Medical Impairment Questionnaire that Dr. Harris had submitted in connection with the appeal, but the Council concluded that the findings in these reports were "similar to forms he previously completed." Id. According to the Council, "[t]he hearing decision provides sufficient rationale explaining why these finding were

originally given little weight, and the Council agrees with this finding."  Id.  The Appeals

Council also reviewed Dr. Batlas' letter "reaffirming a report completed on February 1, 2012,

indicating that [Plaintiff] is not capable of full-time competitive employment, including

remunerative unskilled work."  Id.  Once again, the Council concluded that "[t]his statement is []

a conclusory finding, one that is reserved to the Commissioner."  Id.

## II.    STANDARD OF REVIEW

On a review of a final decision of the Commissioner of the Social Security

Administration, a district court "shall have power to enter, upon the pleadings and transcript of

the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of

Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g); see

Matthews v. Apfel, 239 F.3d 589, 592 (3d Cir. 2001).  The Commissioner's decisions regarding

questions of fact are deemed conclusive on a reviewing court if supported by "substantial

evidence in the record."  42 U.S.C. § 405(g); see Knepp v. Apfel, 204 F.3d 78, 83 (3d Cir. 2000).

While the court must examine the record in its entirety for purposes of determining whether the

Commissioner's findings are supported by substantial evidence, Gober v. Matthews, 574 F.2d

772, 776 (3d Cir. 1978), the standard is highly deferential.  Jones v. Barnhart, 364 F.3d 501, 503

(3d Cir. 2004).  Indeed, "substantial evidence" is defined as "more than a mere scintilla," but less

than a preponderance.  McCrea v. Comm'r of Soc. Sec., 370 F.3d 357, 360 (3d Cir. 2004).  "It

means such relevant evidence as a reasonable mind might accept as adequate."  Plummer v.

Apfel, 186 F.3d 422, 427 (3d Cir. 1999).  A reviewing court is not "empowered to weigh the

evidence or substitute its conclusions for those of the fact-finder."  Williams v. Sullivan, 970

F.2d 1178, 1182 (3d Cir. 1992), cert. denied, 507 U.S. 924 (1993).  Accordingly, even if there is

contrary evidence in the record that would justify the opposite conclusion, the Commissioner's

decision will be upheld if it is supported by the evidence.  See Simmonds v. Heckler, 807 F.2d 54, 58 (3d Cir. 1986).

Disability insurance benefits may not be paid under the Act unless Plaintiff first meets the statutory insured status requirements.  See 42 U.S.C. § 423(c).  Plaintiff must also demonstrate the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months…."  42 U.S.C. § 423(d)(1)(A); see Plummer, 186 F.3d at 427.  An individual is not disabled unless "his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A). Eligibility for supplemental security income requires the same showing of disability.  Id. at § 1382c (a)(3)(A)-(B).

The Act establishes a five-step sequential process for evaluation by the ALJ to determine whether an individual is disabled.  See 20 C.F.R. § 404.1520.  First, the ALJ determines whether the claimant has shown that he or she is not currently engaged in "substantial gainful activity." Id. at § 404.1520(a); see Bowen v. Yuckert, 482 U.S. 137, 146-47 n.5 (1987).  If a claimant is presently engaged in any form of substantial gainful activity, he or she is automatically denied disability benefits. See 20 C.F.R. § 404.1520(b); see also Bowen, 482 U.S. at 140.  Second, the ALJ determines whether the claimant has demonstrated a "severe impairment" or "combination of impairments" that significantly limits his physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c); see Bowen, 482 U.S. at 146-47 n.5.  Basic work activities are defined as "the abilities and aptitudes necessary to do most jobs."  20 C.F.R. § 404.1521(b).  These

activities include physical functions such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling." Id. A claimant who does not have a severe impairment is not considered disabled. Id. at § 404.1520(c); see Plummer, 186 F.3d at 428.

Third, if the impairment is found to be severe, the ALJ then determines whether the impairment meets or is equal to the impairments listed in 20 C.F.R. pt. 404, subpt. P., app. 1 (the "Impairment List"). 20 C.F.R. § 404.1520(a)(4)(iii). If the claimant demonstrates that his or her impairments are equal in severity to, or meet those on the Impairment List, the claimant has satisfied his or her burden of proof and is automatically entitled to benefits. See id. at § 404.1520(d); see also Bowen, 482 U.S. at 146-47 n.5. If the specific impairment is not listed, the ALJ will consider in his or her decision the impairment that most closely satisfies those listed for purposes of deciding whether the impairment is medically equivalent. See 20 C.F.R. § 404.1526(a). If there is more than one impairment, the ALJ then must consider whether the combination of impairments is equal to any listed impairment. Id. An impairment or combination of impairments is basically equivalent to a listed impairment if there are medical findings equal in severity to all the criteria for the one most similar. Williams, 970 F.2d at 1186.

If the claimant is not conclusively disabled under the criteria set forth in the Impairment List, step three is not satisfied, and the claimant must prove at step four whether he or she retains the "residual functional capacity" to perform his or her past relevant work. 20 C.F.R. § 404.1520(e); Bowen, 482 U.S. at 141. If the claimant is able to perform previous work, the claimant is determined to not be disabled. 20 C.F.R. §§ 404.1520(e), 416.920(e); Bowen, 482 U.S. at 141-42. The claimant bears the burden of demonstrating an inability to return to the past relevant work. Plummer, 186 F.3d at 428. Finally, if it is determined that the claimant is no longer able to perform his or her previous work, the burden of production then shifts to the

Commissioner to show, at step five, that the "claimant is able to perform work available in the national economy." Bowen, 482 U.S. at 146-47 n.5; Plummer, 186 F.3d at 428. This step requires the ALJ to consider the claimant's residual functional capacity, age, education, and past work experience. 20 C.F.R. § 404.1520(f). The ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether the claimant is capable of performing work and not disabled. Id.

## III. DISCUSSION

Plaintiff makes two arguments on appeal as to why the ALJ's disability determinations were unsupported by substantial evidence. First, Plaintiff contends that the ALJ failed to properly weigh the medical opinion evidence because she improperly discredited the opinions of Plaintiff's treating psychiatrist, Dr. Harris. Second, Plaintiff maintains that the ALJ failed to properly evaluate Plaintiff's credibility on the severity of his symptoms and resulting limitations. Moreover, Plaintiff argues that the Appeals Council failed to give proper weight to the newly submitted evidence by Dr. Harris.

### a. __Whether the ALJ Properly Considered the Medical Opinion Evidence__

Plaintiff argues that the ALJ improperly gave "little weight" to the opinions of Plaintiff's treating specialist, Dr. Harris.[4] Plaintiff further argues that the ALJ improperly afforded greater weight to the opinions of non-examining doctors, including Drs. Castillo-Velez and Yared. After a review of the record below, the Court finds that the ALJ properly considered all of the medical evidence and made a reasoned decision about the appropriate weight to assign to each report.

---

[4] Plaintiff does not argue that the ALJ improperly weighed Dr. Batlas' opinions, and as such, this Court need not address that issue on appeal.

Generally, "in making a residual functional capacity determination, the ALJ must consider all evidence before [her]," and must "give some indication of the evidence which [she] rejects and [her] reason(s) for discounting such evidence." Burnett v. Comm. of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000); see Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981); see also Goldberg v. Colvin, No. 13-6055, 2015 U.S. Dist. LEXIS 31012, at *24-25 (D.N.J. Mar. 13, 2015). "Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently." Hagans v. Comm'r of Soc. Sec., 694 F.3d 287, 292 (3rd Cir. 2012) (internal quotation marks and citation omitted).

Under 20 C.F.R. § 404.1527(c)(2), a treating source's opinion will be given controlling weight if the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record." Several factors may also be used to determine the weight given to a medical opinion including: length of treatment relationship, the nature and extent of the treatment relationship, supportability by medical evidence, and consistency with the record as a whole. Id. If a treating source's opinion conflicts with that of a non-treating source, "the ALJ may choose whom to credit but cannot reject evidence for no reason or for the wrong reasons." Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000). That is, the ALJ must rely only on "contradictory medical evidence" in rejecting the treating source's opinion, rather than "credibility judgments, speculation or lay opinion." Id. An ALJ is required to provide "an explanation of the reasoning behind [her] conclusions," including "reason(s) for discounting' rejected evidence." Fargnoli v. Halter, 247 F.3d 34, 43 (3d. Cir. 2001).

In the instant matter, Dr. Harris opined that, based on Plaintiff's head injuries, Plaintiff was completely disabled and could not even work at a low stress job without becoming overwhelmed. Dr. Harris further opined that Plaintiff suffered from "marked to extreme limitations" that prevented him from handling both complex and simple tasks. The ALJ disagreed, and concluded that Dr. Harris' opinions were inconsistent with the objective medical evidence, as well as Dr. Harris' own findings on Plaintiff's limitations. The Court finds that the ALJ clearly and plausibly explained why she decided to give some of Dr. Harris' opinions "little weight," and the record supports those determinations. See Morales, 225 F.3d at 317; Plummer, 186 F.3d at 429; see also Fargnoli, 247 F.3d at 43.

The ALJ concluded that Dr. Harris' opinion that Plaintiff suffered from "marked to extreme limitations" was entitled to "little weight" because, contrary to his own opinion, Dr. Harris found that Plaintiff was only "moderately limited" in his ability to understand, remember and carry out one or more step instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain attendance and be punctual; sustain an ordinary routine without supervision; work in coordination with or proximity to others without being distracted; be aware of normal hazards and take precautions; and travel to unfamiliar places or use the public transportation. A.R. at 328-29. The ALJ also found that the opinions of Dr. Miller were contradictory to those of Dr. Harris; Dr. Miller concluded that Plaintiff did not suffer from any thought disorders, and that he was able to successfully perform several cognitive tasks, including naming current and former presidents and counting "by 3's without errors." Id. at 318. Finally, Dr. Miller noted that Plaintiff stated that "he can manage his own [activities of daily living] and perform daily grooming and hygiene tasks without difficulty." Id.

The ALJ also determined that Plaintiff showed improvement when he was taking his medications. This finding is supported by Dr. Harris' own treatment notes. See id. at 302-03, 308. Although Plaintiff continued to struggle with his memory and concentration problems while on medication, Dr. Harris noted that Plaintiff began taking Ritalin and Depakote, and that he reported feeling more in control and focused. Id. at 302-03. Dr. Harris also noted that Plaintiff found Depakote to be "somewhat helpful." Id. at 302.

In addition to being inconsistent with the medical evidence, the ALJ concluded that Dr. Harris' opinions were inconsistent with Plaintiff's function report and Plaintiff's own testimony. In his function report, Plaintiff related that he lives alone, and that he is able to perform personal care and prepare his own meals. Id. at 248-49. In addition, Plaintiff stated that he is able to go outside, as well as drive a car, walk or use public transportation. Id. at 251. Plaintiff further reports that he shops online and manages his own finances, which includes paying bills and handling a savings account. Id. At the hearing, Plaintiff testified that, although he does not like to drive, he is able to do so. Id. at 38-39. He also testified that he is able to use his computer, primarily for online shopping, and that his brother often comes to his apartment and they do chores together. Id. at 57-60.

Ms. Hubert also submitted a function report, on behalf of her son, in which she stated that Plaintiff has no problem with his personal care, and he cooks his own meals or "orders out." Id. at 257-58. He also goes shopping for food on a weekly basis, and he shops online. Id. at 259. Ms. Hubert noted that Plaintiff can drive an automobile, walk and ride a bicycle, and that he engages in "moderate cardio" exercise about once a week. Id. at 259-60.

While it is indisputable that Plaintiff suffers from memory and concentration issues as a result of his head injuries, based on the evidence in the record, the Court finds that the ALJ

properly assigned less weight to Dr. Harris' opinions.  In explaining her rationale, the ALJ did

not rely on "credibility judgments, speculation or lay opinion," but based her decision on both

medical and non-medical evidence in the record.  Morales, 225 F.3d at 317; see Goldberg, 2015

U.S. Dist. LEXIS 31012, at *24-25 (stating that the ALJ must consider both medical and non-

medical evidence).  The ALJ determined that the opinions of Drs. Castillo-Velez and Yared,

non-treating physicians, were more "consistent with the objective medical evidence and

[Plaintiff's] broad range of daily activities, such as his ability to use public transportation, handle

his finances and use a computer."  A.R. at 24.  Specifically, the ALJ found that the record

supported Dr. Castillo-Velez's conclusion, which was confirmed by Dr. Yared, that Plaintiff was

only moderately limited with regard to various work-related activities, and that he could perform

simple tasks.  Id. at 76-78.

**b.** **Whether the ALJ Properly Evaluated Plaintiff's Credibility**

Plaintiff argues that the ALJ improperly discounted his subjective complaints.

Credibility determinations are entitled to substantial deference on appeal.  See Reefer v.

Barnhart, 326 F.3d 376, 380 (3d Cir. 2003) (stating that courts "ordinarily defer to an ALJ's

credibility determination because he or she has the opportunity at a hearing to assess a witness's

demeanor."); see also Izzo v. Comm'r of Soc. Sec., 186 Fed. Appx. 280, 286 (3d Cir. 2006)

(stating that "a reviewing court typically defers to an ALJ's credibility determination so long as

there is a sufficient basis for the ALJ's decision to discredit a witness.").  When making

credibility determinations, the ALJ must consider "all your symptoms, including pain, and the

extent to which your symptoms can reasonably be accepted as consistent with the objective

medical evidence and other evidence."  20 C.F.R. § 404.1529(a); see Hartranft v. Apfel, 181

F.3d 358, 362 (3d Cir. 1999) ("Allegations of pain and other subjective symptoms must be

supported by objective medical evidence."). Rejection of subjective testimony must be based on substantial evidence. See VanHorn v. Schweiker, 717 F.2d 871, 873 (3d Cir. 1983).

In the instant matter, the ALJ thoroughly considered Plaintiff's subjective complaints in reaching the residual functional capacity determination. Specifically, the ALJ concluded, based on the evidence in the record, including Plaintiff's own testimony, that he experiences both memory and concentration difficulties as a result of his head injuries. A.R. at 26. However, the ALJ determined that Plaintiff was "not entirely credible" because his "self-reported activities of daily living are inconsistent with an individual experiencing totally debilitating symptomatology." Id. at 20. The ALJ reasoned that, in his function report, Plaintiff related that he lived alone and performed various activities around his apartment, including chores, making meals and doing the laundry. Id. Plaintiff also reported that he "used public transportation, drove a vehicle, shopped online, handled finances and spent time with others." Id. The ALJ also noted that Plaintiff testified that he went grocery shopping, did chores and used his computer to shop. Id. Additionally, the ALJ took into account Ms. Hubert's function report, which stated that Plaintiff "had no problem with personal care activities, prepared simple meals, did laundry, drove a car, shopped in stores and online, handled finances, engaged in moderate cardiovascular exercise and spent time with a few friends." Id. Finally, the ALJ reasoned that Plaintiff told Dr. Miller that that he can manage his own activities of daily living and perform daily grooming and hygiene tasks without difficulty. Id.

The Court accords great deference to the ALJ's credibility determination of Plaintiff's subjective testimony and finds the ALJ's decision in that regard is supported by substantial evidence. See, e.g., Malloy v. Comm'r of Soc. Sec., 306 Fed. Appx. 761, 765 (3d Cir. 2009)

("Credibility determinations as to a claimant's testimony regarding pain and other subjective complaints are for the ALJ to make.  In view of the evidence presented in the record and of the ALJ's 'opportunity to observe the demeanor and to determine the credibility of the claimant,' these findings are entitled to 'great weight' and should be upheld.") (citation omitted).

c.    **Whether the Appeals Council Properly Considered the New Evidence Presented**

Plaintiff argues that the Appeals Council failed to properly weigh new medical evidence, because the Council did not give any weight to Dr. Harris' report, dated September 22, 2014. Specifically, Plaintiff argues that the Council "offers no more than a conclusory rejection of the medical opinions of Dr. Harris explaining how the record as a whole supports [Plaintiff's] claim of mental disability."  Pl.'s Br. at pg. 29.

In its written decision, after adopting the ALJ's findings and conclusions, the Appeals Council concluded that Plaintiff was not disabled, pursuant to the Social Security Act, through March 31, 2013, the date of last insured.  A.R. at 7.  In reaching that determination, the Council considered Dr. Harris' September 2014 letter, which stated that "it is clear that Judge Toland decided that Mr. Hubert was not disabled and then coddled (sic) together snippets of information to support her decision.  It remains my professional opinion that Mr. Hubert remains unable to engage in gainful employment."  Id. at 372.  According to Dr. Harris, Plaintiff is not able to perform any work-related tasked without constant supervision, nor is he capable of handling "novel or stressful situations."  Id.  However, the Appeals Council concluded that Dr. Harris' opinion is not entitled to any weight because he simply reiterated his prior opinions, and that the Commissioner is empowered to determine whether a claimant is disabled.  Id. at 5.

Here, the Court finds that Plaintiff's argument is misplaced.  Specifically, the Third Circuit has recognized that "a treating source's opinion about a claimant's ability to work is not

entitled to special deference; the disability determination is the province of the [Commissioner] alone." Dula v. Barnhart, 129 Fed. Appx. 715, 719 n.3 (3d Cir. 2005). Thus, the Council was not required to give deference to Dr. Harris' opinion that Plaintiff is "unable to engage in gainful employment." A.R. at 372. Furthermore, the Council properly concluded that Dr. Harris' opinions were nearly identical to his prior opinions, which were rejected by the ALJ. Indeed, in that letter, Dr. Harris failed to present any additional objective evidence, clinical findings or changes in Plaintiff's personal circumstances that were not before the ALJ at the time of her review.

Dr. Harris also submitted a Neurocognitive Disorder Questionnaire in which he opined that Plaintiff had a "severe" cognitive disorder and was "fully dependent" in all activities, and that Plaintiff had "marked" restrictions of activities of daily living, maintaining social functioning and concentration. Id. at 377-78. Dr. Harris additionally submitted a Mental Impairment Questionnaire that concluded that Plaintiff would be expected to miss work more than three times per month and that his limitations existed as far back as 2011. Id. at 387. In its decision, the Appeals Council concluded that the findings in these reports were "similar to forms he previously completed." Id. at 5. According to the Council, "[t]he hearing decision provides sufficient rationale explaining why these finding were originally given little weight, and the Council agrees with this finding." Id.

Here, the Court finds that the Council's decision also supported by the evidence. The questionnaires submitted by Dr. Harris are very similar to his previous medical opinions considered by the ALJ. Because this Court has already determined that the ALJ adequately explained why she discounted Dr. Harris' opinions, I will not belabor the point. However, both the substantive medical and non-medical evidence supports the conclusion that Plaintiff was not

totally disabled through his date of last insured, but rather, he was able to perform work-related activities with some moderate limitations.  Accordingly, the Council's decision that Plaintiff is not disabled is supported by substantial evidence.  See Knepp, 204 F.3d at 83; see also Welch v. Heckler, 808 F.2d 264, 267 (3d Cir. 1986).

IV.    **CONCLUSION**

For the reasons set forth above, the Court finds that the ALJ's decision, as well as the Appeals Council's decision, are supported by substantial evidence in the record.  Accordingly, those decisions are affirmed, and Plaintiff's Complaint is dismissed.


DATE: April 28, 2017


/s/ Freda L. Wolfson
The Honorable Freda L. Wolfson
United States District Judge